OPINION OF THE COURT
 

 Chief Judge Kaye.
 

 This challenge to a 1993 statute authorizing a multibillion dollar bond issue for State and local transportation improvements continues a debate on financing public works projects that has engaged our State throughout its history. The instant litigation attacks the statute both as imprudent fiscal policy and as violative of debt-limiting provisions of the State Constitution. The wisdom of legislation, of course, is not a matter for the courts. As to legality, we conclude — as did both the trial court and Appellate Division — that the statute before us does not violate the State Constitution.
 

 I
 

 On April 15, 1993 Governor Mario Cuomo signed into law, as chapter 56 of the Laws of 1993 (the Act), a four-year, $20 billion financing plan for the State’s transportation system.
 

 The plan provides $10.47 billion for the Dedicated Highway and Bridge Trust Fund (Highway Fund) operated by the State Thruway Authority, and $9.56 billion for the Dedicated Mass Transportation Trust Fund (Mass Transportation Fund), operated by the Metropolitan Transportation Authority (MTA).
 
 [1]
 
 Both Funds, created in 1991, would under the 1993 statute
 
 *238
 
 receive revenues — subject to annual appropriation by the Legislature — from taxes and fees derived from use of the Authorities’ facilities: vehicle registration fees, the motor fuel tax, the petroleum and aviation fuel business tax, and miscellaneous highway use taxes (State Finance Law § 89-b [3]; § 89-c; Tax Law §§ 289-e, 515; Vehicle and Traffic Law § 401; L 1993, ch 56, §§ 16, 31, 33).
 

 The Thruway Authority
 

 The Act authorizes the Thruway Authority to issue up to $4 billion in 30-year bonds for highway and bridge construction.
 
 [2]
 
 Part of the Highway Fund, therefore, is a special reserve to be used by the Authority for debt service and administrative expenses on its bonds. The bond proceeds, in turn, finance improvements for highways, bridges, railways and aviation facilities. Some of the bonds are to be secured by service contracts and sale-and-leaseback agreements between the Authority and the State (L 1993, ch 56, §§ 16, 33).
 

 The Act sets forth several provisos relating to Thruway Authority bonds. Any bonds issued pursuant to authorizations contained in the Act do not constitute a debt of the State. In the words of the Act:
 

 "The notes, bonds or other obligations of the authority authorized by this section shall not be a debt of the state and the state shall not be liable thereon, nor shall they be payable out of any funds other than those of the authority pledged therefor; and such bonds and notes shall contain on the face thereof a statement to such effect” (L 1993, ch 56, § 34, adding Public Authorities Law §385 [1] [d];
 
 see also,
 
 L 1993, ch 56, §§16, 33; Public Authorities Law § 386 [4]; § 1269 [8]; Highway Law § 10-e [5]).
 

 
 *239
 
 Moreover, the statute in the same section declares that the State has "no continuing legal or moral obligation to appropriate money for payments due” under any agreements entered into to effect the implementation of the goals of the Act.
 

 Restrictions on State liability must be included in any cooperative agreements flowing from the Act:
 

 "Each dedicated highway and bridge trust fund cooperative agreement or agreements pursuant to this section shall contain a clause that such agreement or agreements of the state thereunder are not a debt of the state and that such agreement or agreements shall be deemed executory only to the extent of the monies available to the state and no liability on account thereof shall be incurred by the state beyond the monies available for the purpose thereof’ (L 1993, ch 56, § 33, adding Highway Law § 10-e [5];
 
 see also,
 
 L 1993, ch 56, §§ 16, 19, 34; Public Authorities Law § 385 [1] [dj; § 386 [2]; L 1991, ch 329, § 11 [d]).
 

 Further, Thruway Authority bonds issued pursuant to the Act are payable only by legislative appropriations from the Highway Fund and no other source:
 

 "Such obligations * * * shall be special obligations of the authority secured by and payable solely out of amounts appropriated by the legislature as authorized pursuant to section eight-nine-b of the state finance law without recourse against any other assets, revenues or funds of or other payments due to the authority” (Public Authorities Law § 385 [1] [c], added by L 1993, ch 56, § 34;
 
 see also,
 
 Public Authorities Law § 385 [1] [d]).
 

 Finally, the Act specifies that the State may assume the obligations of the Authority or substitute State security for the obligations of the Authority only upon constitutional amendment (L 1993, ch 56, § 34, adding Public Authorities Law § 385 [10]).
 

 The MTA
 

 With regard to the MTA, the Act sets up a $9.56 billion capital funding program for the five-year period ending December 31, 1996. The existing — but not previously funded— Mass Transportation Trust Fund and the Metropolitan Mass
 
 *240
 
 Transportation Operating Assistance Fund would receive appropriations from user-derived taxes and fees and, in turn, would pay into a newly created MTA Dedicated Tax Fund (L 1993, ch 56, § 7, adding Public Authorities Law § 1270-c). Appropriated under the Aid to Localities law as financial assistance for the operations and programs of the MTA, those expenditures are not subject to any restrictions.
 

 The Act does not require the MTA to issue bonds, but if it chooses to do so, it may use the Tax Fund for security and debt service. Any bonds issued by the MTA are subject to the same statutory provisos on State liability as the Thruway Authority bonds. Tax Fund money not used in connection with issuance of bonds can be applied to operating and capital costs of MTA subsidiaries (L 1993, ch 56, §§ 6, 7, 10; Public Authorities Law § 1269 [12]; § 1270-c; State Finance Law § 89-c).
 

 Asserting voter standing, plaintiffs commenced this action on May 24, 1993, alleging that the Act misuses public authorities to circumvent constitutional limitations on contracting debt, including the prohibitions against contracting State debt without a public referendum (NY Const, art VII, § 11), the lending of credit to public corporations (NY Const, art VII, § 8), and assumption of liability of debt obligation of public corporations (NY Const, art X, § 5).
 

 On cross motions for summary judgment, Supreme Court concluded that under
 
 Matter of Schulz v State of New York
 
 (81 NY2d 336), plaintiffs lacked standing to challenge the legislation as violative of any constitutional provision other than article VII, § 11 and, on the strength of
 
 Wein v City of New York
 
 (36 NY2d 610
 
 [Wein I]),
 
 upheld the statute as constitutional. The Appellate Division affirmed those conclusions, as do we.
 

 II
 

 Because plaintiffs assert voter standing, Supreme Court correctly held that the only cognizable challenge to the Act is under article VII, § 11, the constitutional mandate that State contracts for debt be submitted for public referendum. Plaintiffs contend first that debt contracted by the public authorities is indistinguishable from debt contracted by the State and thus within the referendum requirement. Alternatively, they argue that the Act — by pledging appropriation of public revenues — compromises the legal independence of the public au
 
 *241
 
 thorities involved, subjecting them to the debt-limiting provisions imposed on the State. They urge moreover, that as a practical matter the Legislature always will appropriate money for the Funds rather than risk damaging the State’s credit rating. The effect of long-term appropriation-risk bonds, they say, is to "contract debt” within the meaning of article VII, § 11, and the failure to submit the proposed law to a public referendum renders the enactment unconstitutional.
 

 Before proceeding to an examination of each claim, we note that plaintiffs’ burden is a heavy one. It is true that when the main purpose of a statute is to effect " 'indirectly that which cannot be done directly, the act is to that extent void, because it violates the spirit of the fundamental law’ ”
 
 (Wein v State of New York,
 
 39 NY2d 136, 145
 
 [Wein II],
 
 quoting
 
 People ex rel. Burby v Howland,
 
 155 NY 270, 280). It is also true, however, that enactments of the Legislature — a coequal branch of government — enjoy a strong presumption of constitutionality. In particular, we give deference to public funding programs essential to addressing the problems of modern life, unless such programs are "patently illegal”
 
 (see, Hotel Dorset Co. v Trust for Cultural Resources,
 
 46 NY2d 358, 369-370, quoting
 
 Comereski v City of Elmira,
 
 308 NY 248, 254).
 

 Plaintiffs have not satisfied their burden of proving unconstitutionality beyond a reasonable doubt.
 

 Ill
 

 In considering plaintiffs’ first contention — that the debt of the Authorities is debt of the State — we begin analysis with a history of the referendum requirement and the origin of public authorities.
 

 The State Constitution of 1777, our first, provided that the legislative power of this State is to be vested in the Senate and Assembly (art II). The unlimited grant of legislative authority — when exercised in the arena of borrowing and spending — led to abuses and prompted a movement for reform of State borrowing practices
 
 (see, Matter of Schulz v State of New York,
 
 81 NY2d 336, 346;
 
 People v Westchester County Natl. Bank,
 
 231 NY 465, 471-473). Of particular concern, and the impetus for change, was the lending of public credit to private, "irresponsible” corporations. Following the onset of economic depression in 1837, private railroad corporations defaulted on obligations that had been assumed on the strength of liberally granted State credit. The State assumed
 
 *242
 
 the liabilities, with no hope of reimbursement, and by 1845 more than three fifths of the entire State debt was the result of such loans. Public works were suspended in response to the debt crisis
 
 (see, Wein II,
 
 39 NY2d, at 142-143,
 
 supra;
 
 2 Lincoln, Constitutional History of New York, at 87, 100 [1906]).
 

 The precursor to the referendum requirement of article VII, § 11, proposed in 1841 by Assembly Member Arphaxed Loomis of Herkimer County, was adopted under the Constitution of 1846 (former art VII, § 12) as part of a sweeping reform of public borrowing practices, in an effort to protect the State from the uncertain and possibly disastrous consequences of incurring future liabilities — "liabilities easy for a current generation to project but a burden on future generations”
 
 (Wein II,
 
 39 NY2d, at 144,
 
 supra).
 
 Known as "the people’s resolution,” the amendment reserved to voters the power to determine, by referendum, whether a proposed law creating debt would take effect (2 Lincoln,
 
 op. cit,
 
 at 73-83). In its present form, the Constitution provides:
 

 "Except the debts specified in sections 9 and 10 of this article, no debt shall be hereafter contracted by or in behalf of the state, unless such debt shall be authorized by law, for some single work or purpose, to be distinctly specified therein. No such law shall take effect until it shall, at a general election, have been submitted to the people, and have received a majority of all the votes cast for it and against it at such election nor shall it be submitted to be voted on within three months after its passage nor at any general election when any other law or any bill shall be submitted to be voted for or against.
 

 "The legislature may, at any time after the approval of such law by the people, if no debt shall have been contracted in pursuance thereof, repeal the same; and may at any time, by law, forbid the contracting of any further debt or liability under such law” (art VII, § 11).
 

 Long-term State obligations are the concern of article VII, §11
 
 (Wein v Levitt,
 
 42 NY2d 300, 304
 
 [Wein III]).
 
 By article VII, §9, the State may validly contract short-term debt in authentic anticipation of the receipt of taxes and revenues, for the purposes and within the amounts of appropriations previously made, if repaid within one year (NY Const, art VII, § 9;
 
 *243
 

 Wein II,
 
 39 NY2d, at 146,
 
 supra).
 
 State debt that extends beyond one year, therefore, is subject to the referendum requirement of article VII, § 11. Simultaneously, a provision was adopted forbidding gifts or loans of State credit to "any individual, association, or corporation” (NY Const of 1846, art VII, § 9).
 
 [3]
 

 The referendum requirement is not simply a limit on discretion. In
 
 People ex rel. Hopkins v Board of Supervisors
 
 (52 NY 556), we observed that it was legally impossible for the Legislature to contract debt in the absence of approval by the people through referendum: such approval is a condition precedent to the creation of debt. Any purported long-term debt created in the absence of a public referendum is simply not legally binding on the State.
 

 Following adoption of the referendum requirement, the Legislature sought ways to provide long-term funding for public works projects that would not require public referendum. In 1851, without public referendum, the Legislature authorized issuance of canal certificates, to be paid from canal revenues, which by their terms were not to be deemed to create a debt against the State. While we struck down the statute because it failed to comply with a constitutional mandate as to application of canal revenues
 
 (see, Newell v People,
 
 7 NY 9, 92), we noted in passing that even though purchasers of the canal certificates may have no legal remedy against the State if canal revenues proved insufficient to pay the certificates, the State would no doubt make good on them by reason of moral obligation. Moreover, canal revenues paid out to certificate holders represented money that would be diverted from public coffers. The declaration that the certificates were not to be deemed debt was therefore "an evasion, if not a direct violation, of the constitution”
 
 (Newell,
 
 7 NY, at 93,
 
 supra).
 

 The Legislature then passed a series of town bonding acts that authorized — and later compelled — cities to borrow money to invest in railroad company stock. The question whether the State could authorize one of its instrumentalities to undertake commitments the Constitution prohibited the State itself from undertaking reached this Court in
 
 Bank of Rome v Village of Rome
 
 (18 NY 38). We upheld the scheme, leading to ratifica
 
 *244
 
 tian of constitutional restrictions on municipal debt in 1874, 1884 and 1894.
 

 Shortly after the turn of the century, the Legislature devised a new vehicle for funding public works projects that appeared to insulate the State from the burden of long-term debt: legislative creation of legally separate public benefit corporations, known as public authorities, to discharge particular functions. The first such entity was the Port of New York Authority, created in 1921
 
 (see, Collins v Manhattan & Bronx Surface Tr. Operating Auth.,
 
 62 NY2d 361, 367). In theory, a public authority would be self-supporting, able to meet debt obligations through revenues obtained from its own valuable assets, such as fares and user fees. Such public benefit corporations would separate their administrative and fiscal functions from those of the State (1929 Opns Atty Gen 223, 224), to " 'protect the State from liability and enable public projects to be carried on free from restrictions otherwise applicable’ ”
 
 (Matter of Plumbing, Heating, Piping & Air Conditioning Contrs. Assn. v New York State Thruway Auth.,
 
 5 NY2d 420, 423, citing 1951 Opns Atty Gen 130, 132).
 

 We rejected an early challenge to the effectiveness of language disclaiming the State’s liability for public authority debts, where bonds were secured solely by the revenues of the issuing authority
 
 (see, Robertson v Zimmermann,
 
 268 NY 52, 62). Although public authority debt was not legally binding on the State, we nevertheless recognized in
 
 Williamsburgh Sav. Bank v State of New York
 
 (243 NY 231) that the State might choose to honor a liability as a moral obligation. We stated, however, that whether to recognize a moral obligation is within the discretion of the State:
 

 "[I]t rests solely with the State through its Legislature to determine whether it will recognize a claim even though founded upon equity and justice and allow it to be developed into a legal demand and * * * the exercise of this choice cannot be delegated to any one else[.] * * * Practically the sole power of the courts in this respect is to determine whether all of the facts established in a given case and presumably within the knowledge of the Legislature do establish such a foundation of equity and justice that the Legislature within the rules established by the courts was authorized,
 
 if it saw fit so to do, to
 
 recognize the justice of the
 
 *245
 
 claim” (243 NY, at 244-245,
 
 supra
 
 [emphasis added]).
 

 In Williamsburgh> the State had indicated its intent to allow enforcement of a moral obligation, permitting judicial determination of a claim
 
 (id.; see also, Board of Supervisors v State of New York,
 
 153 NY 279, 293 [unenforceable moral obligation paid by the State]).
 

 To prevent the State from assuming public authority debt as a moral obligation — and to overrule constitutionally the effect of
 
 Williamsburgh
 
 — the 1938 Constitution (our present Constitution) explicitly empowered public authorities to issue bonds and incur debt but prevented the State from assuming that liability:
 

 "Neither the state nor any political subdivision thereof shall at any time be liable for the payment of any obligations issued by such a public corporation heretofore or hereafter created, nor may the legislature accept, authorize acceptance of or impose such liability upon the state or any political subdivision thereof; but the state or a political subdivision thereof may, if authorized by the legislature, acquire the properties of any such corporation and pay the indebtedness thereof’ (NY Const, art X, § 5;
 
 see,
 
 3 Revised Record of 1938 Constitutional Convention of State of NY, at 2259-2283; Galie,
 
 New York State Constitution,
 
 at 226-228).
 

 To limit proliferation of public authorities, the new Constitution specified that only the Legislature, through special act, could create them
 
 (see, City of Rye v Metropolitan Transp. Auth.,
 
 24 NY2d 627).
 

 Those who spoke in opposition to allowing public authorities expansive discretion in performing formerly State functions were in the minority. Debate at the Constitutional Convention included discussion of whether the State would be liable in the event an authority were unable to meet its obligations, and the language of the amendment was tailored to make clear that it would not. The Chair of the Committee on the Legislature and its Powers, George Fearon, supported the new provision, stating, " T believe that when people buy [authority] bonds they should know definitely and certainly that the credit of the State of New York and that the credit of the municipality is not behind those bonds. There should not be any question about it’ ” (Quirk and Wein, A
 
 Short Constitu
 
 
 *246
 

 tional History of Entities Commonly Known as Authorities,
 
 56 Cornell L Rev 521, 573 [1971], quoting 3 Revised Record of 1938 Constitutional Convention,
 
 op. cit.,
 
 at 2276).
 

 By article VII, § 8 and article VIII, § 1 of the 1938 Constitution, the prohibition against gifts or loans of State credit was made applicable to public corporations
 
 (see, Wein II,
 
 39 NY2d, at 144,
 
 supra).
 
 While the provision bars the State from lending its "credit” to a public corporation, the State is nonetheless free to give money to a public authority and to commit itself to giving future gifts
 
 (see, Comereski v City of Elmira,
 
 308 NY 248). The distinction is rooted in the fact that the granting of State money — while depleting current State coffers and making those funds unavailable for other purposes — nevertheless does not bind future generations or create the same dangers of collapse, insolvency and crisis associated with the abuse of credit. Such a distinction presumes, of course, that the State has adequate funds to support a gift
 
 (Wein II,
 
 39 NY2d, at 154,
 
 supra
 
 [Jasen, J., dissenting]).
 

 The Constitution was adopted by the people on November 8, 1938 at a general election, giving full recognition to the existence of public benefit corporations, their independent capacity to contract debt, and the continued power of the State to make gifts of money to those authorities.
 
 [4]
 
 Thus, contrary to plaintiffs’ contention, there can be no question that — for the purpose of contracting their own legally binding obligations — the Thruway Authority and the MTA are public benefit corporations existing independently of the State (NY Const, art X, § 5;
 
 Matter of Plumbing, Heating, Piping & Air Conditioning Contrs. Assn, v New York State Thruway Auth.,
 
 5 NY2d 420, 424-425,
 
 supra; Metropolitan Transp. Auth. v County of Nassau,
 
 28 NY2d 385, 390).
 
 [5]
 
 Moreover, contracting
 
 *247
 
 of debt by public authorities was unquestionably not the aim of the referendum requirement, adopted in 1846, since those entities did not exist at the time.
 

 That the 1938 Constitution expressly empowered public authorities to contract debt independently of the State lends further support to the conclusion that the Act, by authorizing the Thruway Authority and the MTA to issue bonds, does not contract legally binding debt upon the State. The power of the State and these Authorities to engage in this practice has been secured by vote of the people, through article X, § 5 of the Constitution, and any change must come by constitutional amendment. The courts have not made the Constitution and they cannot unmake it
 
 (see, Sgaglione v Levitt,
 
 37 NY2d 507, 514).
 

 IV
 

 Though the debt of the Thruway Authority and MTA are not a legal obligation of the State, plaintiffs also contend that the Act contracts debt of the State by imposing a moral obligation on the Legislature to continue appropriating revenue to the special Funds. A moral obligation, however, is not in and of itself "debt”
 
 (see, Firestone Tire & Rubber Co. v Agnew,
 
 194 NY 165, 170) — although it may constitute sufficient consideration to support a promise to pay
 
 (see, Meyer v Price,
 
 250 NY 370, 376).
 
 [6]
 
 Debt, within the contemplation of the State constitutional debt-limiting provisions, has a settled meaning
 
 (see, Wein I,
 
 36 NY2d 610,
 
 supra),
 
 and we are not persuaded that plaintiffs’ argument for an expanded definition has merit.
 

 
 *248
 
 To bring themselves within article VII, § 11, plaintiffs characterize the Act as creating "moral obligation” debt — a term apparently coined in the 1960’s to describe appropriation-risk bonds that could not legally bind the Legislature beyond a session but would create a "moral obligation” to appropriate money should a public authority be unable to redeem its bonds
 
 (see,
 
 Quirk and Wein,
 
 Rockefeller’s Constitutional Sleight of Hand,
 
 Empire State Report, at 430 [Nov. 1975];
 
 see also,
 
 Tyler,
 
 The Steady Growth of Backdoor Financing,
 
 Empire State Report, at 213, 222 [June 1975]). The existence of such a moral obligation would provide some assurance (though not an enforceable legal obligation) to bondholders that the bonds would retain their value.
 

 The bonds authorized by the Act were not labelled "moral obligation bonds” by the Legislature, and entirely apart from nomenclature the Act does not create such an obligation. The Act requires a statement on the face of the bonds that they are not a debt of the State and are payable only out of the Authorities’ funds. Moreover, the Act disavows existence of a moral obligation on the part of the State to appropriate revenues in the future. These disclaimers — particularly when read in light of the constitutional prohibition against State assumption of authority debt (NY Const, art X, § 5) — are sufficient to remove any reasonable expectation on the part of bondholders that the State will guarantee return in the event of default on the part of the Authority or that the bonds place them in privity with the State
 
 (see, Matter of Mullane v McKenzie,
 
 269 NY 369, 376,
 
 rearg denied
 
 270 NY 563,
 
 supra
 
 [no moral obligation arises where State acting in accordance with its legal rights]).
 

 Plaintiffs’ heavy reliance on
 
 Williamsburgh
 
 (243 NY 231,
 
 supra)
 
 as establishing the possibility that the State could be held liable on a moral obligation is unavailing. First — unlike the Act — the statute at issue in
 
 Williamsburgh
 
 expressly recognized the possibility of a moral obligation. Second, article X, § 5 was adopted after
 
 Williamsburgh
 
 precisely to overrule constitutionally the possibility of the State assuming a moral obligation as to debt of a public authority.
 

 Most critically, a moral obligation cannot be judicially imposed upon the State in the absence of its consent to be so bound
 
 (see, Williamsburgh,
 
 243 NY, at 247,
 
 supra).
 
 Even where a moral obligation exists, that circumstance creates no enforceable right on behalf of the aggrieved party. Rather,
 
 *249
 
 where circumstances support a determination that the State has a valid moral obligation to honor a private claim, we will permit the State to waive immunity from liability. But that is a unilateral right
 
 (Ruotolo,
 
 83 NY2d 248,
 
 supra; People v Westchester County Natl. Bank,
 
 231 NY 465,
 
 supra),
 
 and the effect is simply to permit adjudication of a claim.
 

 In short, a moral obligation does not create "debt,” since it creates no enforceable right on the part of the one to whom the obligation is owed. Moreover, the Act could not make plainer that the State recognizes no moral obligation on its part to continue appropriations. Plaintiffs’ claim that the Act creates a moral obligation to pay which falls within the constitutional definition of "debt” therefore also must fail.
 

 V
 

 Plaintiffs point as well to the State’s need to protect our economy as binding future Legislatures to continue with annual appropriations to the Funds for the life of the bonds. They claim that, in reality, the bonds are backed by the State’s full faith and credit because the consequences of default would be ruinous, assuring that appropriations will be made. Indeed, plaintiffs document instances where State officials appear to have characterized the future appropriations as legal obligations of the State, despite the Act’s disclaimers. Thus, in plaintiffs’ view, the Act obligates the State to continue appropriations for the life of the bonds — some 30 years —creating long-term State "debt.”
 

 We have previously held that a proposal to fund in a subsequent year, subject to legislative appropriation and explicit disclaimer, does not create legally binding debt
 
 (Levy v McClellan,
 
 196 NY 178, 195-196;
 
 see also, Public Util. Dist. No. 1 v Washington Pub. Power Supply Sys.,
 
 104 Wash 2d 353, 370, 705 P2d 1195, 1207 [WPPS bonds do not constitute legal or equitable pledge upon State]). In
 
 People ex rel. Hopkins v Board of Supervisors
 
 (52 NY 556, 564,
 
 supra),
 
 we observed that while the Legislature might endeavor to incur future liabilities, to be appropriated on a year-to-year basis without submitting the spending plan to the people, "[n]o harm or loss has or can come from this practice.” Such spending plans are effectual only to the extent subsequent Legislatures indeed do "give effect to them by providing the means and directing their payment, but the discretion and responsibility is with them as if no former appropriations had been made. No duty
 
 *250
 
 or obligation is devolved upon them by the acts of their predecessors”
 
 (id.,
 
 at 565). If uneffected by future Legislatures, the laws will simply "remain upon the statute books, but * * * only * * * as monuments of the extravagance, recklessness or folly of those by whom they were enacted,” creating no legally binding debt or liability upon the State
 
 (id.,
 
 at 565).
 

 Our constitutional limitations, however, have consistently been construed as addressing legally binding debt. As in
 
 Wein I,
 
 where we upheld subsidies for debt service on bonds issued by the Stabilization Reserve Corporation contingent on annual appropriation, indebtedness is precluded by the very terms of chapter 56, as well as the prohibition of article X, § 5 against State assumption of authority debt (36 NY2d, at 617). We rejected in
 
 Wein I
 
 the suggestion that a gift of money to a public authority — upheld in
 
 Comereski
 
 (308 NY, at 253-254)— violated the letter or spirit of the constitutional limitations on contracting debt
 
 (Wein I,
 
 36 NY2d, at 616,
 
 supra).
 

 Next, in
 
 Wein II
 
 (39 NY2d 136,
 
 supra),
 
 we upheld a plan giving aid to New York City and the Municipal Assistance Corporation that would be funded through borrowing pursuant to the short-term debt provision of article VII, § 9 as not violating the constitutional prohibition against giving or lending credit of the State. In
 
 Wein III
 
 (42 NY2d 300,
 
 supra),
 
 a law promising to indemnify State officers from any claims arising from purchase of risky authority bonds was not "borrowing” of any kind, but rather "a contingent cost of doing State business payable routinely out of the general fund” (42 NY2d, at 305).
 

 Apart from constituting a line of precedents upon which reliance has been placed in the financial marketplace, these cases established that a contractual obligation on the part of government to make future "gifts” to a special fund created to retire debt of an independent public authority is not offensive to article VII, § 8; article VIII, § 1; or article X, § 5 of the Constitution.
 

 We define "debt” no differently for purposes of article VII, § 11. While the Legislature might make the appropriations to the Funds, to be used in turn to service the Authorities’ debt, it is not bound to do so. Should it fail to do so, and the Authority default, the State is not liable to the bondholders under the provisions of the Act. Because the State does not become indebted, the financing subject to appropriation does not constitute the lending of credit or assumption of the
 
 *251
 
 liability of a public corporation, or indebtedness of the State for purposes of the constitutional limits on such debt
 
 (Wein I,
 
 36 NY2d, at 618,
 
 supra).
 
 Instead, the funds — if appropriated— constitute a permissible gift of money to a public corporation out of existing revenues, creating no debt (NY Const, art VII, § 8;
 
 Comereski v City of Elmira,
 
 308 NY 248,
 
 supra).
 
 Laws making annual appropriations from a special fund do not and cannot create debts within the meaning of the referendum requirement
 
 (Rockaway Pac. Corp. v Stotesbury,
 
 255 F 345, 348 [ND NY]).
 

 Plaintiffs’ third argument therefore must fail as well.
 

 VI
 

 In sum, neutral principles of law and consistent precedents of this Court, upon which decades of commercial transactions have been premised, lead us to uphold the validity of the particular legislation before us. If (as plaintiffs urge) modern ingenuity, even gimmickry, have in fact stretched the words of the Constitution beyond the point of prudence, that plea for reform in State borrowing practices and policy is appropriately directed to the public arena, where indeed it is now under serious consideration
 
 (see,
 
 NY Senate Bill S 4359,
 
 replacing
 
 Assembly Bill A 7586 [Apr. 4, 1993]; Joint Press Release of Governor and Comptroller [Mar. 15, 1994]; Opn of Atty Gen to Legislature re NY Senate Bill S 4359 [May 11, 1993]).
 

 We have reviewed plaintiffs’ remaining claims, and conclude they lack merit.
 

 Accordingly, the order of the Appellate Division should be affirmed, without costs.
 

 Judges Simons, Titone, Bellacosa, Smith and Ciparick concur; Judge Levine taking no part.
 

 Order affirmed, without costs.
 

 [1]
 

 . The Thruway Authority was created in 1950 by the New York State Thruway Authority Act (Public Authorities Law §352). It operates and maintains the 641-mile New York State Thruway, as well as New York’s 524-mile canal system. In addition, it finances and performs economic development and transportation projects, and since 1972 has through bonds financed State and local highway capital projects.
 

 The MTA was created in 1967 by Public Authorities Law § 1263
 
 (City of Rye v Metropolitan Transp. Auth.,
 
 24 NY2d 627). Through its affiliates and subsidiaries — the New York City Transit Authority, Manhattan and Bronx Surface Transit Operating Authority, the Long Island Rail Road Company,
 
 *238
 
 Metro-North Commuter Railroad Company, and the Triborough Bridge and Tunnel Authority — MTA is charged with implementing and operating a unified mass transportation system in New York City and the nearby suburban counties.
 

 [2]
 

 . Sections 13 and 14 of the Act authorize the Thruway Authority to issue bonds to finance $1.01 billion over the next four years for local highways and bridges through three programs: (a) the Consolidated Local Highway Assistance Program for local highway and bridge projects; (b) the Municipal Streets and Highways Program; and (c) the Suburban Highway Improvement Program for improvements on local and State highways and bridges in the Hudson Valley and on Long Island.
 

 [3]
 

 . This prohibition was made binding on cities and other local governments by article VIII, § 11 of the 1874 amendments.
 

 [4]
 

 . We have consistently recognized public authorities as legal entities separate from the State, enjoying an existence separate and apart from the State, its agencies and political subdivisions
 
 (see, e.g., Matter of New York Pub. Interest Research Group v New York State Thruway Auth.,
 
 77 NY2d 86, 92-93;
 
 Methodist Hosp. v State Ins. Fund,
 
 64 NY2d 365;
 
 Collins,
 
 62 NY2d 361, 367,
 
 supra; Grace & Co. v State Univ. Constr. Fund,
 
 44 NY2d 84, 88;
 
 Patterson v Carey,
 
 41 NY2d 714;
 
 Matter of Dormitory Auth. [Span Elec. Corp.J,
 
 18 NY2d 114;
 
 Matter of Plumbing, Heating, Piping & Air Conditioning Contrs. Assn, v New York State Thruway Auth.,
 
 5 NY2d 420, 423-424).
 

 [5]
 

 .
 
 McCabe v Gross
 
 (274 NY 39), holding unlawful the City of Troy’s effort to issue bonds through a school district "authority” is not to the contrary. There, we construed the effect of a constitutional provision limiting city debt as extending to debt of city school districts, which are subdivisions of the city. By contrast, the Constitution, through article X, § 5, separates debt of
 
 *247
 
 public benefit corporations and that of the State. Public authority bonds are —by constitutional mandate — not legal liabilities of the State.
 

 [6]
 

 . A moral obligation cognizable by the State generally falls into one of two classifications. The first are claims involving benefits conferred by private persons upon the State which the State has continued to enjoy without the return of
 
 quid pro quo.
 
 The second are claims involving injuries and damages wrongfully inflicted upon individuals by those in State service or others for whose acts the State might justly be regarded as responsible
 
 (Farrington v State of New York,
 
 248 NY 112, 116). Where a moral obligation exists, the Legislature may use public money to remedy an injustice in cases even though no legal obligation to do so exists, so long as some higher obligation of honor, fairness or broad public responsibility is recognized
 
 (Matter of Mullane v McKenzie,
 
 269 NY 369). As we recently stated in
 
 Matter of Ruotolo v State of New York,
 
 moral obligation is properly found where legislative failure to act would be a "travesty of justice” (83 NY2d 248, 259).