OPINION OF THE COURT
Marcy S. Friedman, J.
Petitioners Develop Don’t Destroy (Brooklyn), Inc. (DDDB) and Prospect Heights Neighborhood Development Council, Inc. (PHNDC) move, under the New York State Equal Access to Justice Act (EAJA) (CPLR 8601), for payment by respondent Empire State Development Corporation (ESDC) of attorney’s fees and expenses incurred by petitioners in prosecuting these CPLR article 78 proceedings.[1] The DDDB petitioner seeks $169,626 in fees (not including the fees associated with the instant motion). The PHNDC petitioner seeks $146,000 in fees and $7,900 in expenses.
Petitioners commenced these article 78 proceedings to challenge the ESDC’s affirmance, in September 2009, of a modified general project plan (MGPP) for the Atlantic Yards Project in Brooklyn. They argued that the ESDC failed to comply with the State Environmental Quality Review Act (SEQRA) by affirming the MGPP without requiring a supplemental environmental impact statement (SEIS). Petitioners’ claims in this proceeding are discussed at length in three prior decisions to which the court refers. (See 26 Mise 3d 1236[A], 2010 NY Slip Op 50424[U] [2010] [denying petitions]; 30 Mise 3d 616 [2010] [granting re-argument and remanding for further findings]; 33 Mise 3d 330 [2011] [granting supplemental petitions and requiring SEIS], affd 94 AD3d 508 [1st Dept 2012].)
Petitioners claim that they are prevailing parties in this proceeding, and are therefore entitled to attorney’s fees and expenses under the EAJA. (Baker off in support 1i 2; Butzel off in support 11 10.) Respondent argues that petitioners are not entitled to attorney’s fees under the EAJA because the proceeding was not a “civil action brought against the state.” In addition, respondent argues that petitioners are not prevailing parties within the meaning of the EAJA, and that the ESDC’s position in the article 78 proceeding was “substantially justified.” (Respondent’s mem of law in opposition at 1.)
*782 Applicability of the EAJA
The EAJA provides, in pertinent part, that “a court shall award to a prevailing party, other than the state, fees and other expenses incurred by such party in any civil action brought against the state, unless the court finds that the position of the state was substantially justified or that special circumstances make an award unjust.” (CPLR 8601 [a].) Under the EAJA, “ ‘[sjtate’ means the state or any of its agencies or any of its officials acting in his or her official capacity.” (CPLR 8602 [g].)
The EAJA “was enacted to ‘improv[e] access to justice for individuals and businesses who may not have the resources to sustain a long legal battle against an agency that is acting without justification.’ ” (Matter of New York State Clinical Lab. Assn. v Kaladjian, 85 NY2d 346, 351 [1995], quoting Governor’s Mem approving L 1989, ch 770, 1989 NY Legis Ann at 336.) The State EAJA is modeled after the Federal Equal Access to Justice Act (28 USC § 2412 [d] [1] [A]). Like its federal counterpart, the EAJA, with exceptions not here relevant, applies to “any civil action or proceeding brought to seek judicial review of an action of the state” (CPLR 8602 [a]).
The first inquiry, then, is whether respondent ESDC is the State or a state agency for purposes of the EAJA. The parties have not cited, and the court’s own research has not located, any case that has determined whether the ESDC, a public benefit corporation, qualifies as a state agency within the meaning of the EAJA where, as here, it has served as lead agent for SEQRA review of a development project. However, substantial authority holds that the determination of whether a public benefit corporation is a state agency must be made on a case-by-case basis, taking into account the nature and purpose of the entity, the functions it performs, and the statute at issue.
As the Court of Appeals explained in John Grace & Co. v State Univ. Constr. Fund (44 NY2d 84, 88 [1978]):
“The mere fact that [a public benefit corporation] is an instrumentality of the State, and as such, engages in operations which are fundamentally governmental in nature does not inflexibly mandate a conclusion that it is the State or one of its agencies for purposes of [the particular law at issue]. Instead, a particularized inquiry into the nature of the instrumentality and the statute claimed to be applicable to it is required” (citations omitted).
*783 In John Grace & Co., the Court was called upon to determine whether the State University Construction Fund was the State or an agency for purposes of a law authorizing adjustments to public construction contracts to reflect increased costs of certain materials. The Court concluded that it was not, because the Fund was created to receive and administer monies for the construction of facilities for the State University of New York, and the legislature explicitly chose to impose different requirements for construction contracts made by the Fund than for contracts made by the State and other public entities.
In Matter of Apollon v Giuliani (246 AD2d 130 [1st Dept 1998]), an article 78 proceeding challenging a City University of New York (CUNY) tuition increase for community colleges, the issue before the Court was whether CUNY was the State or a state agency for EAJA purposes. Citing John Grace & Co., the Court noted that “[t]he Court of Appeals has required a case-by-case determination of whether an entity like CUNY, which is independent of the State but is an instrumentality of the State and performs a ‘fundamentally governmental’ function, will be treated as the State for a particular purpose” (id. at 135). The Court held that CUNY was not subject to the EAJA because the “case exclusively involves community colleges, and the challenged funding decisions all related to the City’s obligation to fund those colleges.” (Id.) However, the Court contrasted senior colleges, with respect to which CUNY’s role was “more closely analogous” to a state agency. (Id.)
In Matter of Levy v City Commn. on Human Rights (85 NY2d 740, 745 [19953), the Court of Appeals further clarified:
“The general theme of [the Court’s prior] decisions is that public authorities and other public benefit corporations are created to accomplish a specific purpose or mission and are endowed with the freedom and flexibility necessary to achieve that mission. They are ‘independent and autonomous’ to the extent that they should be free from requirements imposed on other State agencies that would interfere with the accomplishment of the public corporation’s purpose.”
There, the Court held that the New York City Transit Authority, a public benefit corporation, was subject to the New York City Human Rights Law. While its holding was based in part on *784 statutory construction,[2] the Court reasoned in the alternative: “The purpose of the New York City Transit Authority is to acquire and operate transit facilities. It cannot be seriously contended . . . that compliance with the prohibitions against employment discrimination would interfere with its function and purpose . . . .” (Id. [citation omitted].)
Applying these precepts, the court holds that the ESDC, in its role as lead agent for SEQRA in the Atlantic Yards Project, is an agency of the State for purposes of the EAJA. The legislative history of the establishment of the Urban Development Corporation (UDC), which is a public benefit corporation that does business as the ESDC, leaves no doubt that the purpose for which the UDC was established was to make grants and loans to promote economic development.
The Court of Appeals has summarized the circumstances leading to the creation of public benefit corporations as follows:
“Shortly after the turn of the century, the Legislature devised a new vehicle for funding public works projects that appeared to insulate the State from the burden of long-term debt: legislative creation of legally separate public benefit corporations, known as public authorities, to discharge particular functions. ... In theory, a public authority would be self-supporting, able to meet debt obligations through revenues obtained from its own valuable assets, such as fares and user fees. Such public benefit corporations would separate their administrative and fiscal functions from those of the State (1929 Opns Atty Gen 223, 224), to protect the State from liability and enable public projects to be carried on free from restrictions otherwise applicable.” (Schulz v State of New York, 84 NY2d 231, 244 [1994] [internal quotation marks and citations omitted].)
The UDC, in particular, was created in 1968 by the New York State Urban Development Corporation Act (UDCA). (See McKinney’s Uncons Laws of NY § 6254 [UDCA § 4, as added by L 1968, ch 174, § 1].) As noted by the Court of Appeals,
*785 “[t]he legislative findings emphasized that “ ‘[i]t is hereby declared to be the policy of the state to promote a vigorous and growing economy, to prevent economic stagnation and to encourage the creation of new job opportunities in order to protect against the hazards of unemployment, reduce the level of public assistance to now indigent individuals and families, increase revenues to the state and to its municipalities and to achieve stable and diversified local economies’ (McKinney’s Uncons Laws of NY § 6252).” (Bordeleau v State of New York, 18 NY3d 305, 312 n 1 [2011], rearg denied 18 NY3d 918 [2012].)
“The Act created the Empire State Economic Development Fund and the JOBS Now Program, which authorize the UDC to make grants and loans for economic development purposes (see McKinney’s Uncons Laws of NY §§ 6266-h, 6266-i).” (Id.)
The ESDC appears at times to argue that it is not the State based on the mere fact that it is a public benefit corporation. (Respondent’s mem of law in opposition at 9-10.) This argument wholly ignores the case law, discussed above, which analyzes whether an entity that is a public benefit corporation qualifies as the State or its agency within the meaning of the particular statute claimed to be applicable to the acts of the entity. The ESDC correctly argues, however, that where the ESDC acts in furtherance of the purpose for which it was formed — the financing and promotion of economic development — it will not be held to be the State or its agency.
Thus, in Bordeleau, on which the ESDC relies, the Court of Appeals rejected a claim by taxpayers that grants and loans made by the ESDC to various private companies violated the ban imposed by article VII, § 8 (1) of New York State Constitution against loaning “money of the state” to any private corporation. The Court reasoned that a “prime purpose for creating such corporations was to separate their administrative and fiscal functions from the State and its subdivisions,” and to enable the corporations to “function with a freedom and flexibility” not permitted to the State. (18 NY3d at 315-316 [internal quotation marks and citations omitted].)
Similarly, in Matter of Smith v Levitt (30 NY2d 934 [1972]), also cited by the ESDC, the Court of Appeals rejected a claim that the UDC was the State for purposes of State Finance Law § 111, prohibiting payment of “money of the state” without an *786 audit. The Court noted that payments from the UDC’s bond proceeds are not money of the State, and that the UDC “is not a State agency within the intendment of the constitutional and statutory provisions cited.” (Id. at 935.)
Here, in contrast, the ESDC was not performing fiscal functions to promote economic development, as to which it required “freedom and flexibility” from requirements imposed on other state agencies that would interfere with the accomplishment of those functions. (See generally Levy, 85 NY2d at 745.) Rather, it was acting as lead agent for SEQRA review of the Atlantic Yards Project, and thus performing a “fundamentally governmental” function as a decision-maker. (See generally John Grace & Co., 44 NY2d at 88.)
“The heart of SEQRA is the Environmental Impact Statement (EIS) process.” (Matter of Jackson v New York State Urban Dev. Corp., 67 NY2d 400, 415 [1986].) As lead agent, the ESDC was charged with the discretionary decision-making power of assessing whether preparation of an SEIS was required. (Matter of Riverkeeper, Inc. v Planning Bd. of Town of Southeast, 9 NY3d 219, 231 [2007]; 6 NYCRR 617.9 [a] [7] [i] [a]-[c].[3]) Moreover, although SEQRA does not contain a provision addressing the standard for judicial review, it is well settled that the deferential standard applicable to review of decisions of other governmental agencies is also applicable to SEQRA determinations. (Roosevelt Islanders for Responsible Southtown Dev. v Roosevelt Is. Operating Corp., 291 AD2d 40, 54 [1st Dept 2001], rearg denied 2002 NYApp Div LEXIS 3663 [2002], Ivs denied 97 NY2d 613 [2002], 98 NY2d 608 [2002].)[4]
In sum, as lead agent for SEQRA, the ESDC was charged with discretionary decision-making power, was acting to enforce and ensure compliance with state law, and was subject to judicial review according to the standards applicable to governmental *787 agencies generally. While the ESDC has been held not to be the State or a state agency where it functions as a public benefit corporation financing and promoting economic development, this core function will not be impeded by application of the EAJA to the ESDC where it acts in its separate capacity as a governmental decision-maker. The court accordingly holds that the ESDC is the State or its agency within the meaning of the EAJA for purposes of review of its determinations under SEQRA.
Finally, the court notes that this holding is consistent with the decisions of courts which have reviewed findings that the ESDC was required to make, under statutes other than SEQRA, in order for the Atlantic Yards Project to proceed. (See Goldstein v Pataki, 516 F3d 50 [2d Cir 2008] [deeming the ESDC’s status as a public benefit corporation irrelevant, and holding that the ESDC was a “state agency” deputized by the legislature for purposes of making blight findings necessary to the exercise of the ESDC’s eminent domain power under the UDCA]; Matter of Develop Don’t Destroy [Brooklyn] v Urban Dev. Corp., 59 AD3d 312, 322 [1st Dept 2009] [holding that “(i)t makes no difference that the agency through which the government has here acted, the ESDC, is organized as a public benefit corporation,” and that the ESDC acted as a state agency in making findings designating the project as a land use improvement project under the UDCA], lv denied 13 NY3d 713 [2009], rearg denied 14 NY3d 748 [2010].)
Prevailing Party
Having concluded that the EAJA is applicable to these article 78 proceedings for review of the ESDC’s findings under SEQRA, the court turns to the issue of whether petitioners are prevailing parties within the meaning of the EAJA. The EAJA defines a “prevailing party” as a “plaintiff or petitioner in the civil action against the state who prevails in whole or in substantial part where such party and the state prevail upon separate issues.” (CPLR 8602 [f].) Interpreting this provision, the Court of Appeals held:
“[A] party has ‘prevailed’ within the meaning of the State EAJA if it has succeeded in acquiring a substantial part of the relief sought in the lawsuit. Thus, a ‘prevailing party’ is not one who has succeeded on merely ‘any significant issue’ in the litigation which achieved only ‘some of the benefit’ *788 sought in bringing the lawsuit — which is the Federal standard. Rather, it is a plaintiff who can show that it succeeded in large or substantial part by identifying the original goals of the litigation and by demonstrating the comparative substantiality of the relief actually obtained.” (Matter of New York State Clinical Lab., 85 NY2d at 355 [citation omitted].)[5]
The ESDC contends that a substantial question exists as to whether petitioners are prevailing parties because this court “rejected many of petitioners’ claims.” (Respondent’s mem of law in opposition at 15.) Petitioners counter that they are prevailing parties because they were successful in obtaining reconsideration of the environmental impacts of Phase II of the Atlantic Yards Project. (Petitioners’ reply mem of law at 11-12.)
Petitioners’ success must be evaluated in light of the claims they asserted in these proceedings, the scope of the Project, and the extent to which the Project had progressed as of the time the proceedings were heard. As noted in this court’s prior decisions, the Atlantic Yards Project, which has been described as the largest single-developer project in New York City history, extends over 22 acres and is to be built in two phases. Phase I includes the Barclays Center sports arena, a new Metropolitan Transportation Authority (MTA) rail yard, and four to five buildings. Phase II includes construction of 11 of the project’s 16 hi-rise buildings, which will contain 5,000 to 6,000 residential units including affordable housing, and development of open space. (33 Misc 3d at 333.)
The petitions challenged the 2009 MGPP primarily on the ground that the ESDC lacked a rational basis for its continued use of a 10-year build-out in assessing the environmental impacts of the Project, and for its refusal to order an SEIS for the Project. This claim, in turn, was based on the fact that construction of 6 of the 11 Phase II buildings required acquisition by the developer, Forest City Ratner Companies (FCRC), of air rights owned by the MTA. However, a renegotiated agree *789 ment between the MTA and FCRC eliminated FCRC’s obligation to acquire the air rights at the inception of the Project, and afforded FCRC until 2030 to complete the acquisition. In arguing that the 10-year build-out was reasonable, the ESDC emphasized that it was negotiating a development agreement that would require FCRC to use “commercially reasonable efforts” to complete the Project within 10 years, and that “failure to commence construction of each building would result in . . . monetary penalties being imposed on [FCRC].” (26 Misc 3d 1236[A], 2010 NY Slip Op 50424[U], *5 [2010].)
In initially denying the petitions, this court concluded that the ESDC had articulated reasons for its continued use of the 10-year build-out that were “marginally sufficient” to survive judicial scrutiny under the deferential standard for judicial review of an agency’s SEQRA determinations. (2010 NY Slip Op 50424[U], *9.)
Petitioners subsequently moved for reargument based on the terms of the development agreement that was negotiated. In granting reargument, the court reasoned:
“As close reading of the Development Agreement shows, the Agreement plainly contemplates an outside build date of 25 years for completion of the 11 Phase II buildings which constitute the substantial majority of the residential buildings at the Project. It provides detailed timetables, firm commencement dates for the arena and Phase I work, no commencement dates (other than for the platform) for the Phase II residential construction/[6]1 and apparently far stricter penalties for failure to meet the deadlines for the arena and Phase I work than for failure to meet the 2035 outside deadline for substantial completion of the Phase II buildings or for failure to use commercially reasonable efforts to complete the Project by 2019.
“In its papers in opposition to the article 78 petitions, ESDC repeatedly cited, as the basis for its continuing use of the 10-year build-out, the MGPP provision stating ESDC’s intent to require FCRC to use commercially reasonable efforts to complete the Project by 2019, and the summary of the Develop *790 ment Agreement Neither of these documents gave any indication that the Development Agreement would include a 25-year substantial completion date for the Phase II construction. While ESDC’s papers acknowledged that there were mandatory commencement dates for construction of the first few buildings on the arena block, the papers did not discuss the absence of any deadlines for commencement of the Phase II buildings, were completely silent as to the 2035 outside date, and contained no discussion of the disparate penalties provided for failure to meet the deadlines for Phase I and II construction. ESDC’s papers left the inaccurate impression that the commercially reasonable efforts provision was the focus of the Development Agreement, whereas the Agreement in fact contained numerous far more detailed construction deadlines for the Project which cannot be ignored in addressing the rationality of the build date.” (30 Mise 3d at 626 [citation omitted].)
The court also found that the ESDC had an obligation, which it failed to meet, to bring the actual terms of the development agreement to the court’s attention
“in order to correct the totally incomplete representations, made in the summary of the Development Agreement and in ESDC’s papers in opposition to the article 78 petitions, as to the terms that were included in the Development Agreement regarding the imposition and enforcement of deadlines for completion of the Project.” {Id. at 627.)
Noting that the development agreement “cast a completely different light on the Project build date” {id. at 631), the court remanded the matter for further findings by the ESDC on the impact of the development agreement and the renegotiated MTA agreement on the continued use of a 10-year build-out for the Project and the need for an SEIS.
On the remand, the ESDC concluded that the 10-year build-out remained reasonable and that an SEIS was not required. Within one month of the issuance of the remand order, the ESDC’s environmental consultant prepared a technical analysis. Approximately two months after the order, the ESDC passed a resolution which concluded that the development and MTA agreements did not have a material effect on the 10-year date, although the resolution acknowledged that it was “unlikely that the Project will be constructed on a 10-year schedule.” (33 Mise *791 3d at 333.) The resolution further stated that the delay would not result in any new significant adverse impacts not previously considered in the original EIS which had used a 10-year build-out. (33 Mise 3d at 332-333.)
In its final decision holding that an SEIS was required, this court reasoned that the technical analysis was “hastily prepared” and “perfunctory” (id. at 346), and that the ESDC failed, in the numerous respects discussed in the decision, to “undertake a meaningful assessment of the impacts of the potentially vastly extended period of construction on the various areas of environmental concern.” (Id. at 343.) As to petitioners’ request for a stay, the court noted, with respect to Phase I, that although the 2009 MGPP made a major change to the construction schedule of Phase II, it did not effect a material change in Phase I construction. Moreover, extensive construction of Phase I work had already occurred — in particular, excavation and foundation work for the arena had been performed and completion of the arena was expected in 2012; infrastructure for the Project had been commenced in 2007 and was nearly complete; work on a new subway entrance was in progress; and a temporary rail yard for the MTA had been completed. (33 Misc 3d at 348.) The court held that a stay of Phase I work would not be appropriate, given the extent of this work and the fact that it had been performed under the original plan, which had been subjected to and withstood a prior SEQRA challenge. (Matter of Develop Don’t Destroy [Brooklyn] v Urban Dev. Corp., 59 AD3d 312 [2009], supra-, 33 Misc 3d at 348-349.) The court denied the requested stay of Phase II construction, as premature. More particularly, the court held that it was undisputed that Phase II work would not commence for many years, and petitioners could renew their request for a stay in the unlikely event that FCRC was ready to proceed with Phase II before the SEIS was completed. (33 Misc 3d at 349.)
This court’s determination that an SEIS was required was affirmed by the Appellate Division which “agree[d] . . . that ESDC’s use of a 10-year build date . . . lacks a rational basis and is arbitrary and capricious.” (94 AD3d at 510.) The Court reasoned:
“When it approved the MGPI] ESDC was aware that, under a new agreement with the MTA, FCRC had until 2030 to acquire the air rights necessary for the phase II construction. ESDC knew that the then forthcoming development agreement would *792 provide for a significantly extended substantial completion date of 2035. . . . Moreover, ESDC has acknowledged that it is unlikely that the Project will be constructed on a 10-year schedule .... “Nevertheless, ESDC relied on a provision in the MGPP and, later, in the development agreement that required FCRC to use ‘commercially reasonable efforts’ to meet the 10-year deadline .... ESDC also maintained that FCRC had a financial incentive to complete the Project by 2019. However, the term ‘commercially reasonable efforts’ is not defined in either the MGPP or the development agreement. While the development agreement provides specific dates for the construction of the arena and phase I buildings, it does not provide specific commencement dates for phase II construction, other than those noted above, and, while it provides for damages for delays in phase I construction, it does not provide for significant financial penalties for delays in phase II construction.” (Id.)
The Appellate Division also noted that the ESDC “repeatedly informed the court that it relied on the terms of the development agreement in approving the MGPP” (Id.) The Court specifically approved this court’s finding that the development agreement was necessary to make meaningful review of the ESDC’s determination possible by correcting the ESDC’s “incomplete representations” regarding the terms of the development agreement. (Id. at 511.)
As review of the claims and decisions in these proceedings shows, petitioners prevailed on their SEQRA claim for further environmental review of Phase II of the Project, involving the “substantial majority” of residential buildings to be constructed. (30 Misc 3d at 626.) The SEIS will result in reconsideration of the environmental impacts of Phase II, based on a 25-year build-out compared with a 10-year build-out. As petitioners persuasively argue, the review process should lead to “consideration of alternatives that may more effectively meet the ostensible goal of the project to alleviate blights and create affordable and market-rate housing with less adverse environmental impacts.” (Petitioners’ reply mem of law at 11-12.) Given the magnitude of Phase II construction, and petitioners’ goal of obtaining further review of the environmental impacts of such construction, the court holds that they have succeeded in achieving a substantial part of the relief sought in this litigation. (See gen *793 erally Matter of New York State Clinical Lab. Assn., 85 NY2d at 355.)
The court further holds that petitioners’ assertion of other claims in this proceeding does not alter their status as prevailing parties. The DDDB petitioner also asserted claims that the MGPP was not a “plan” within the meaning of the UDCA, and that the development agreement illegally conditioned the development of affordable housing on the availability of public subsidies. The PHNDC petitioner asserted a claim that the ESDC illegally delegated control to FCRC over the schedule for the Project. The initial decision of the proceedings treated these claims as secondary to the primary SEQRA claim, and dismissed them with limited discussion. (26 Misc 3d 1236[A], 2010 NY Slip Op 50424[U], *2 [2010].)
Petitioners also sought further environmental review and a stay of construction of Phase I of the Project. However, as discussed in the prior decisions, extensive infrastructure work for Phase I was in progress at the time of the hearing of the initial proceedings (26 Misc 3d 1236[A], 2010 NY Slip Op 50424[U], *9 [2010]), and extensive excavation and foundation work on the arena and other Phase I work was underway when petitioners’ supplemental petitions challenging the ESDC’s refusal to order an SEIS were heard after the remand. (33 Mise 3d at 348.) The extent of work that had already been performed on Phase I was a significant factor in this court’s determination denying a stay of Phase I construction. (Id.) Had the ESDC disclosed the terms of the development agreement that were being negotiated when the petitions were initially heard, or brought the agreement to the court’s attention promptly after it was executed, construction would not have been as advanced on the arena at the time of the court’s determination requiring an SEIS, and the balance of the equities may have favored a stay pending preparation of the SEIS. Under these circumstances in which the ESDC’s own conduct delayed resolution of the SEQRA claim while construction proceeded, the court does not find that petitioners’ failure to obtain injunctive relief precludes a finding that they are prevailing parties.
Substantial Justification
CPLR 8601 (a) requires an award of attorney’s fees to a prevailing party “unless the court finds that the position of the state was substantially justified or that special circumstances *794 make an award unjust.”[7] “Position of the state” is defined as “the act, acts or failure to act from which judicial review is sought.” (CPLR 8602 [e].)
“Substantially justified” means “justified to a degree that could satisfy a reasonable person, or having a reasonable basis both in law and fact.” (Matter of New York State Clinical Lab. Assn., 85 NY2d at 356 [internal quotation marks and citation omitted].) Further,
“[t]he focus when determining whether a petitioner is a prevailing party is aimed at the degree of success obtained by the petitioner. Whether the government’s ‘position in the litigation’ is substantially justified . . . focuses, not on the government’s success or failure, but on the reasonableness of its position in bringing about or continuing the litigation.” (Id. at 357 [internal quotation marks and citation omitted].)
“The determination of whether the State’s position was substantially justified is committed to the sound discretion of the court of first instance and is reviewable as an exercise of judicial discretion.” (Matter of Graves v Doar, 87 AD3d 744, 747 [2d Dept 2011].) “The burden of establishing substantial justification rests with the State, which must make a strong showing to support its position.” (Id.)
The ESDC claims that it had a reasonable basis for, although it did not prevail on, its position that its use of a 10-year build-out in assessing environmental impacts of the 2009 MGPP was reasonable, and that an SEIS was not required in connection with the MGPP (Respondent’s mem of law in opposition at 17.) This claim reflects no small audacity, in light of the court’s prior findings as to the ESDC’s review process. These findings included what the court characterized as the ESDC’s “deplorable lack of transparency” in failing even to mention the MTA renegotiated agreement by name in discussing changes the agreement made in the deadlines for completion of the Project (26 Misc 3d 1236[A], 2010 NY Slip Op 50424[U], *9 [2010]); the ESDC’s continuing lack of transparency and failure to meet its obligation to bring the development agreement to the court’s attention in order to correct “totally incomplete representations” made in opposition to the article 78 petitions regarding such deadlines (30 Misc 3d at 631, 627); and, upon remand, the ESDC’s performance of a wholly “perfunctory” analysis of the *795 environmental impacts of a build-out of the Project that was potentially more than doubled under the MTA and development agreements. (33 Misc 3d at 346-347.) This is not a case in which the ESDC’s determinations were substantially justified.[8]
Attorney’s Fees
Pursuant to the State EAJA, “ [flees shall be determined pursuant to prevailing market rates for the kind and quality of the services furnished, except that fees and expenses may not be awarded to a party for any portion of the litigation in which the party has unreasonably protracted the proceedings.” (CPLR 8601 [a].) For the reasons stated above, petitioners are entitled to their fees and expenses for prosecuting these proceedings. However, further briefing is required on the standards specifically applicable to the EAJA for calculating fees — e.g., whether the lodestar or other method should be used; whether petitioners are entitled to fees for the appeal and for the instant motion; and whether fees are recoverable under the EAJA at prevailing market rates, notwithstanding that petitioners’ counsel charged petitioners reduced rates based on their not-for-profit status. (Cf. Blum v Stenson, 465 US 886, 893 [1984] [whether prevailing market rates may be used to calculate attorney’s fees, regardless of whether plaintiff is represented by private or nonprofit counsel, is issue of interpretation of statute under which fees are sought — there, 42 USC § 1988].) The matter will be referred to a Special Referee for hearing on these issues.
It is accordingly hereby ordered that petitioners’ motion for attorney’s fees pursuant to the State EAJA is granted; and it is further ordered that the Special Referee shall hear and report with a recommendation on the amount of attorney’s fees to be awarded to petitioners, and specific recommendations on the following issues: (1) the standards for calculating fees under the EAJA; (2) whether petitioners are entitled to fees for the appeal and for the instant motion; and (3) whether fees are recoverable under the EAJA at prevailing market rates where, as here, petitioners’ counsel charged petitioners at reduced rates. The parties shall serve supplemental briefs setting forth comprehen *796 sive legal authority under the EAJA on these issues. The briefs shall be filed with the Special Referee to whom the hearing is assigned. Provided that, in the event of and upon the filing of a stipulation of the parties, as permitted by CPLR 4317, the Special Referee, or another person designated by the parties to serve as referee, shall determine the aforesaid issues. And it is further ordered that a motion to confirm or reject the report of the Special Referee shall be made within 15 days of the filing of the report; and it is further ordered that, within 15 days of the date of entry of this order, movants shall serve a copy of this order with notice of entry on the Clerk of the Special Referee’s office (Room 119) to arrange a date for the reference to a Special Referee.

. Petitioners brought separate article 78 proceedings which were heard together.

. In construing the statute, the Court held: “[T]he Administrative Code’s definition of the term ‘person[s]’ includes corporations and the term ‘private’ cannot be read to modify the separate reference to ‘corporations’ without making that separate reference redundant. We therefore determine that Administrative Code § 8-105 . . . includes public corporations.” (Levy, 85 NY2d at 743-744 [citation omitted].)

. This rule provides that “[t]he lead agency may require a supplemental EIS, limited to the specific significant adverse environmental impacts not addressed or inadequately addressed in the EIS that arise from . . . changes proposed for the project; or . . . newly discovered information; or ... a change in circumstances related to the project.”

. As held in Matter of Riverkeeper (9 NY3d at 231-232), judicial review “of an agency determination under SEQRA is limited to whether the agency identified the relevant areas of environmental concern, took a ‘hard look’ at them, and made a ‘reasoned elaboration’ of the basis for its determination.” (Internal quotation marks and citation omitted.) A court may set aside a lead agency’s determination as to the necessity for an SEIS “only if it is arbitrary, capricious or unsupported by the evidence.” (Id. at 232.)

. CPLR 8600 provides that the EAJA was intended “to create a mechanism authorizing the recovery of counsel fees and other reasonable expenses in certain actions against the state of New York, similar to the provisions of federal law contained in 28 U.S.C. § 2412(d) and the significant body of case law that has evolved thereunder.” However, based on the definition of prevailing party in the State EAJA (CPLR 8602 [f]), which does not appear in the Federal EAJA, the Court of Appeals has held that the State EAJA “impose[s] a stricter standard for demonstrating prevailing party status” than does the Federal EAJA. (Matter of New York State Clinical Lab., 85 NY2d at 354.)

. The decision granting reargument should have stated that the development agreement provided no commencement dates for Phase II construction other than dates for commencement of the platform and one Phase II building. (See 33 Misc 3d at 337 n 3.)

. No claim is made here that special circumstances make an award unjust.

. Contrary to the ESDC’s contention, this court’s denial of sanctions (and therefore implicit finding that the ESDC’s conduct was not “frivolous” within the meaning of 22 NYCRR part 130) (see order dated July 13, 2011) hardly supports the ESDC’s claim that its position in these proceedings was substantially justified.