OPINION OF THE COURT
 

 G.B. Smith, J.
 

 This is a constitutional challenge to the Municipal Assistance Corporation Refinancing Act, which was enacted as part of a 2003 budget bill to assist the City of New York in retiring certain long-term debt. The wisdom of this legislation is not a matter for this Court to address
 
 (see Schulz v State of New York,
 
 84 NY2d 231, 237 [1994]). As to its legality, we conclude that the Act does not violate the State or Federal Constitutions.
 

 I.
 

 In the 1970s, defendant City of New York experienced a serious fiscal crisis that brought it to the brink of bankruptcy. In an effort to save the City from default, the State Legislature created the Municipal Assistance Corporation (MAC), which issued long-term bonds and used the proceeds to refinance the City’s short-term debt. The bonds were to be financed over the next 30 years by diverting to MAC a portion of the state sales tax revenue that would otherwise be available to the City. The last remaining MAC bonds are scheduled to mature in 2008.
 

 In 2003, with $2.5 billion left to pay on the MAC debt service (then due at a rate of $500 million annually for the remaining
 
 *529
 
 five years), the City faced another fiscal crisis. The Legislature sought to provide a financing mechanism to assist the City in satisfying the remainder of its MAC debt. In May 2003, over the Governor’s veto of the entire budget bill, the Legislature enacted the Municipal Assistance Corporation Refinancing Act (L 2003, ch 62, part A4; ch 63, part V) to achieve this purpose. The Act amended the Public Authorities Law by adding a new section, section 3238-a, and amending existing section 3240. In doing so, the Act allowed the City to receive the sales tax revenue that was being diverted to MAC and thereby retain the remaining $2.5 billion that it owed on the debt service, while requiring the State to make 30 annual payments to the City of $170 million, or a total of $5.1 billion. The City intended to use the annual payments to finance bonds to be issued by a public benefit corporation established for this purpose. The proceeds from the sale of the bonds were to be used to retire the City’s MAC debt.
 

 Local Government Assistance Corporation
 

 Plaintiff Local Government Assistance Corporation (LGAC) was charged with channeling the payments from a portion of state sales tax revenues. LGAC was established by chapter 220 of the Laws of 1990 as part of a state fiscal reform program.
 
 [1]
 
 As a public benefit corporation, it was authorized to issue $4.7 billion in bonds to provide funding for public services. LGAC bonds were issued pursuant to general bond resolutions adopted in 1991 and in 2002. The resolutions constitute contracts between LGAC and its bondholders and contain promises that the bondholders would have first priority on the tax dollars available to LGAC for debt service, and included a pledge that no equal or prior lien on these funds could be created. Additionally, pursuant to Public Authorities Law § 3241 (1), the State has pledged not to limit or alter LGAC’s right to fulfill its agreements with its bondholders or to impair the bondholders’ rights or remedies.
 

 The debt service on LGAC bonds is payable from revenues derived from state sales and compensating use taxes, one percentage point of which must be deposited in the Local Govern
 
 *530
 
 ment Assistance Tax Fund (Tax Fund). The Tax Fund is held in the joint custody of the State Comptroller and the Commissioner of Taxation and Finance
 
 (see
 
 State Finance Law § 92-r [1]). Pursuant to Public Authorities Law § 3240 (1), each year the Chairperson of LGAC must certify to the Governor and the Comptroller its debt service requirements and certain other required expenditures for the upcoming fiscal year. Upon annual appropriation by the Legislature, the funds needed are transferred by the Comptroller
 
 (see
 
 Public Authorities Law § 3240 [3]; State Finance Law § 92-r [5]). Only after LGAC has received its funds in accordance with its certified request can the remaining revenues in the Tax Fund be distributed to the general fund of the State Treasury
 
 (see
 
 State Finance Law § 92-r [5]).
 

 Although the State is not legally obligated to appropriate the funds that LGAC has sought in its certification
 
 (see
 
 Public Authorities Law § 3240 [5]),
 
 [2]
 
 the State has a powerful incentive to make the requested appropriation because the Comptroller is prohibited from distributing any money in the Tax Fund to the state general fund unless and until LGAC receives the payments according to its certification
 
 (see
 
 State Finance Law § 92-r [5] [a] [i]). This incentive has been referred to as the statute’s “trapping mechanism.” Since the inception of LGAC, there has annually been a legislative appropriation and substantial excess funds have been transferred each year from the Tax Fund to the State Treasury.
 

 The MAC Refinancing Act
 

 The MAC Refinancing Act created Public Authorities Law § 3238-a, which requires LGAC to make annual payments of $170 million to the City during each City fiscal year until 2034. The first paragraph of that provision states:
 

 “Notwithstanding any inconsistent provision of law,
 
 *531
 
 [LGAC] shall transfer to the city of New York [$170 million] from the resources of the corporation pursuant to section [3239] of this title. Such payment shall be made during each city fiscal year. Such payments from the corporation shall be made from the fund [i.e., the Tax Fund] established by [State Finance Law § 92-r] and in accordance with the provisions thereof’ (Public Authorities Law § 3238-a).
 

 The Act also amended Public Authorities Law § 3240 (1) to require the Chairperson of LGAC to include in its annual certifications to the Governor and Comptroller the $170 million payments it is required to make to the City. The Act further amended Public Authorities Law § 3240 (5), which contained the executory clause and addressed the manner and timing of the State’s payments to LGAC, by adding a sentence at the end of the provision which stated, “Provided however, this subdivision shall not apply for payments made pursuant to section [3238-a] of this title.”
 
 [3]
 

 In addition, the Act permits the City’s Mayor to assign the $170 million payments to a new not-for-profit local development corporation (see Public Authorities Law § 3238-a). Once the Mayor gives notice to LGAC and the Comptroller of the assignment, the payments must be made directly to the assignee. The assigned payments then become the property of the assignee for all purposes. In accordance with this statutory scheme, the Mayor of the City of New York irrevocably assigned the City’s right to receive the LGAC payments to defendant Sales Tax Asset Receivable Corporation (STARC), the not-for-profit development corporation created for this purpose. Under the assignment agreement between the City and STARC, STARC would issue bonds financed by the LGAC payments. The proceeds from the bonds would be used to retire the City’s remaining $2.5 bil
 
 *532
 
 lion MAC debt. Any net proceeds not necessary to retire the remaining MAC debt would be paid to the City.
 

 The Instant Litigation
 

 On August 6, 2003, citing legal and policy concerns regarding LGAC’s obligations under the MAC Refinancing Act, LGAC’s three directors
 
 [4]
 
 unanimously adopted a resolution (1) directing LGAC not to participate in the STARC transaction, (2) authorizing and directing its coexecutive directors to explore the legal issues and to hire litigation counsel and (3) declaring that LGAC had no intention of making the payments to the City on behalf of the State until the legal issues were resolved either by litigation or by legislative action.
 

 As a result of LGAC’s resolution, STARC restructured its initial bond offering plan by reducing the amount of bonds it intended to offer and resolving to hold the proceeds from the bonds in escrow, pending resolution of the anticipated litigation, rather than paying the MAC debt. On August 11, 2003, the City issued a preliminary offering circular for $532.2 million worth of Series A bonds set to mature in 2029. The offering circular recognized the stance taken by LGAC with regard to its payment obligations and expressed the City’s intent to commence litigation to enforce its rights under the Act. The circular further stated that neither the State’s payments to LGAC nor LGAC’s payments to STARC constituted a debt of either the State or the City. The circular also acknowledged that LGAC’s obligation to pay STARC in accordance with the Act was subordinated to its obligation to pay its bondholders.
 
 [5]
 

 On August 13, 2003, LGAC commenced this declaratory action in Supreme Court, Albany County, seeking judgment declaring the MAC Refinancing Act unconstitutional. Specifically,
 
 *533
 
 LGAC alleged that the Act (1) violated New York State Constitution, article VII, § 11, by imposing upon the State a multiyear payment obligation without subjecting the payments to either a referendum or a legislative appropriation; (2) violated New York State Constitution, article VIII, § 2, because the assignment of the City’s payments to STARC constituted a contracting of debt without a pledge of the City’s faith and credit; and (3) violated United States Constitution, article I, § 10, by impairing the contractual rights of LGAC’s bondholders.
 

 LGAC also sought a preliminary injunction to prevent STARC from issuing its bonds.
 
 [6]
 
 In a decision dated August 20, 2003, Supreme Court denied LGAC’s motion for a preliminary injunction. On August 27, 2003, the Appellate Division issued a preliminary injunction pending the appeal. Both parties have agreed to comply with the injunction pending this Court’s decision. Thereafter, STARC, along with the City, moved for summary judgment seeking dismissal of the complaint and a declaration that the Act is valid under the State and Federal Constitutions. LGAC cross-moved for summary judgment seeking a declaration that the Act is unconstitutional.
 

 Supreme Court granted the motion and denied the cross motion, declaring the Act constitutional as challenged. As to the challenge that the Act created a multiyear obligation not subject to legislative appropriation, the court reasoned that Public Authorities Law § 3238-a requires that LGAC make its annual $170 million payments from funds appropriated by the State pursuant to State Finance Law § 92-r. Thus, the court concluded, even if the executory clause of Public Authorities Law § 3240 (5) did not apply to LGAC’s payments to the City, other provisions of the Public Authorities Law ensured that the annual payments to the City would, as required, be subject to legislative appropriation.
 

 Relying on this Court’s decision in
 
 Wein v City of New York
 
 (36 NY2d 610 [1975]), Supreme Court rejected LGAC’s argument that the City was unlawfully contracting a debt obligation without pledging its faith and credit. The court determined that no debt was being incurred by the City since the City was not liable to STARC bondholders in the event that LGAC failed to make the annual $170 million payments. Finally, the court concluded that LGAC’s payments to the City under the Act do
 
 *534
 
 not create obligations that are prior or equal to LGAC’s bondholders in that LGAC does not have to pay the City until there has been an appropriation and all of LGAC’s debt service obligations have been met.
 

 Upon LGAC’s appeal, the Appellate Division, with one Justice concurring in part and dissenting in part, modified the order of Supreme Court by (1) reversing that part of the order granting STARC’s motion for summary judgment declaring constitutional the amendment to Public Authorities Law § 3240 (5) and denied LGAC’s cross motion as to that amendment; (2) denying STARC’s motion as to that amendment and granting LGAC’s cross motion as to that amendment; and (3) declaring the amendment unconstitutional and severing it from the remainder of the Act. The Court held that the amendment to section 3240 (5) eliminated the necessity of annual legislative appropriations in violation of the State Constitution. The Court determined, however, that the offending provision was severable because to sever would preserve the legislative objective in promulgating the Act, which was to assist the City in retiring its remaining payments due on the MAC indebtedness.
 

 The Court also concluded that the City’s assignment of the $170 million payments to STARC did not create a debt for the City. Rather, the Court reasoned, only STARC would be liable if LGAC’s failure to make its payments to STARC resulted in STARC’s inability to pay its bondholders. Thus, the debt would be incurred by STARC, not the City. Moreover, the Court stated that LGAC’s obligations of first priority on tax dollars to its bondholders would not be impaired. It concluded that “nothing in the Act explicitly requires that the $170 million be paid at the expense of the existing LGAC bondholders. . . . [BJecause we have severed the constitutionally offensive amendment . . . the $170 million payment is subject to annual appropriation. The Act does not require LGAC to make the $170 million payment in the event of a shortfall in the appropriation.” (5 AD3d 829, 833 [2004].)
 

 One Justice concurred in part and dissented in part. While he concurred in the Court’s conclusion that the Act, as severed, did not violate either of the state constitutional provisions invoked by plaintiffs, he disagreed with the majority’s holding that the Act did not impair the contractual rights of LGAC’s existing bondholders. He reasoned that if the Legislature appropriated funds sufficient for either LGAC’s debt service or STARC payments, but not both, the language of Public Authorities Law
 
 *535
 
 § 3238-a would mandate that LGAC pay STARC before the LGAC bondholders. Because LGAC’s contracts with its bondholders provide that they are to have first priority on money in the Tax Fund, the dissenting Justice concluded that the Act unconstitutionally impairs LGAC’s contracts with its bondholders.
 

 Pursuant to CPLR 5601 (b), LGAC appeals and STARC and the City cross-appeal to this Court. We now modify the order of the Appellate Division and reinstate the order of Supreme Court, thus declaring the MAC Refinancing Act constitutional.
 

 II.
 

 On this appeal, LGAC argues that the MAC Refinancing Act unconstitutionally requires LGAC, acting on behalf of the State, to make multiyear payments which are not subject to legislative appropriations
 
 (see
 
 NY Const, art VII, § 11). LGAC contends that this infirmity is not severable from the remainder of the Act. Additionally, LGAC contends that the Act violates the prohibition against revenue financing by authorizing the City to assign the payments to STARC, and thereby to incur debt, without requiring the City to pledge its faith and credit
 
 (see
 
 NY Const, art VIII, § 2). LGAC urges further that the Act unconstitutionally impairs the contracts of LGAC’s existing bondholders
 
 (see
 
 US Const, art I, § 10). In their cross appeal, STARC and the City argue that the Act’s amendment to Public Authorities Law § 3240 (5) is constitutional and does not exclude the payments from legislative appropriations.
 

 At the outset, we again note that the wisdom of this refinancing plan is not a matter for this Court to evaluate. Moreover, LGAC bears a heavy burden to overcome the strong presumption of constitutionality that attaches to every statute
 
 (see Schulz v State of New York,
 
 84 NY2d at 241;
 
 Hotel Dorset Co. v Trust for Cultural Resources,
 
 46 NY2d 358, 370 [1978]). Particularly where the statute concerns public financing programs, courts are required to exercise restraint and give deference to the legislative enactment, unless the program is “patently illegal”
 
 (Hotel Dorset Co.,
 
 46 NY2d at 370, quoting
 
 Comereski v City of Elmira,
 
 308 NY 248, 254 [1955];
 
 see also Schulz,
 
 84 NY2d at 241). Thus, in order to prevail, LGAC must prove beyond a reasonable doubt that “in any degree and in every conceivable application the [legislative enactment] suffers wholesale constitutional impairment”
 
 (Matter of Moran Towing Corp. v Urbach,
 
 99 NY2d 443, 448 [2003] [citation and internal quotation marks omitted]).
 

 
 *536
 
 We conclude that LGAC has not satisfied this substantial burden.
 

 Legislative Appropriations
 

 New York State Constitution, article VII, § 11, provides, in relevant part, “[N]o debt shall be hereafter contracted by or in behalf of the state, unless such debt shall be authorized by law, for some single work or purpose . . . . No such law shall take effect until it shall, at a general election, have been submitted to the people, and have received a majority of all the votes cast for and against it at such election.” As this Court has recognized, a statute providing for multiyear payments pursuant to annual legislative appropriations does not create a debt within the meaning of article VII, § 11, and is not subject to the public referendum requirement (see
 
 Schulz,
 
 84 NY2d at 249, 251). Thus, the 30 annual payments that LGAC is required to make pursuant to the MAC Refinancing Act, passed without a public referendum, must be subject to annual legislative appropriations in order to satisfy this provision of the State Constitution.
 

 LGAC contends that the amendment to Public Authorities Law § 3240 (5) added a sentence at the end of that subdivision that renders the Act unconstitutional. Public Authorities Law § 3240 (5) reads as follows:
 

 “The agreement of the state contained in this section shall be deemed executory only to the extent of appropriations available for payments under this section and no liability on account of any such payment shall be incurred by the state beyond such appropriations. The state, acting through the director of the budget, and the corporation may enter into, amend, modify, or rescind one or more agreements providing for the specific manner, timing, and amount of payments to be made under this section, but only in conformity with this section.
 
 Provided however, this subdivision shall not apply for payments made pursuant to section [3238-a] of this title ”
 
 (emphasis added).
 

 LGAC argues that the final sentence of the subdivision exempts the payments to the City from the executory clause contained in the first sentence, and therefore obligates the State to provide the funds for LGAC’s payments even without an appropriation. We disagree.
 

 Statutes must be construed to effectuate the intent of the Legislature. Reading the Act as a whole, we conclude that the
 
 *537
 
 amended sentence was intended to apply only to the previous sentence, not to the entire subdivision, and the failure to make that intent plain in the statute—the result of legislative haste— cannot serve to void the Act. The previous sentence permitted LGAC and the State to “amend, modify, or rescind one or more agreements providing for the specific manner, timing, and amount of payments to be made” by LGAC. In enacting the amended sentence, the Legislature sought to prevent the State from changing the specific timing of the payments mandated under the Act. The City’s fiscal year begins July 1, whereas the State’s fiscal year begins April 1. It was therefore important from a budgeting perspective that the $170 million be available to the City no later than July 1. Accordingly, the Legislature intended to remove the discretion of the State Budget Director and LGAC with respect to the timing of the annual payments, so as to ensure that LGAC’s payment to the City or its assignee would occur during each city fiscal year.
 

 LGAC’s contrary contention—that the Legislature’s intent in amending Public Authorities Law § 3240 (5) was to exempt the payments to the City from the requirement of appropriation—is belied by the reality that the MAC Refinancing Act otherwise continues to explicitly require that the payments be subject to annual legislative appropriation.
 

 Public Authorities Law § 3238-a states, in pertinent part:
 

 “Notwithstanding any inconsistent provision of law, [LGAC] shall transfer to the city of New York [$170 million] from the resources of the corporation pursuant to section [3239] of this title. Such payment shall be made during each city fiscal year. Such payments from the corporation shall be made from the fund established by [State Finance Law § 92-r] and in accordance with the provisions thereof.”
 

 As noted above, the fund established by State Finance Law § 92-r (1) is the Tax Fund. LGAC receives its revenue from the Tax Fund only by legislative appropriation. Section 92-r (5) (a) of the State Finance Law states that once the Comptroller receives the certification of LGAC’s payment requirements, submitted pursuant to Public Authorities Law § 3240, the Comptroller must pay the amount certified “pursuant to an appropriation.” The Act amended Public Authorities Law § 3240 (1) to require LGAC to include in its annual certification the $170 million payments it is required to make to the City. Moreover, section 3240 (3) states that the Comptroller must pay the
 
 *538
 
 amount certified by LGAC “provided that any such amounts shall have been first appropriated by the state.”
 

 Thus, upon construing the Act as a whole and reading its parts together to determine the intent of the Legislature, as we must, we conclude that the intent of the Legislature is clear: to enact a constitutionally sound statute pursuant to which the State would assist the City in meeting its debt obligations to MAC by providing for annual payments to the City through legislative appropriations channeled through LGAC. Moreover, both STARC and the City acknowledge that LGAC’s annual payments to the City must be appropriated. Of course, if no appropriation is made from the Tax Fund, LGAC cannot access the funds from which it must make its payments to the City, and the City would not receive the payment. Notably, section 3238-a requires that LGAC’s payments be made from the Tax Fund, and even if revenue were available to LGAC from other sources, it could not be used to make the payments to the City. Thus, the Act ensures that any payments to the City are subject to an annual legislative appropriation notwithstanding the amendment to Public Authorities Law § 3240 (5). Indeed, the entire purpose of channeling the annual payments through LGAC is to make use of LGAC’s trapping mechanism, which gives the Legislature an incentive, but not an obligation, to appropriate; in fact appropriation remains, as it must, ultimately discretionary.
 

 If, as plaintiffs contend, the Legislature had wanted to create an absolute and unconditional requirement of payments to the City, not subject to appropriation, it would simply have provided that in each of the next 30 years the State shall pay $170 million annually to the City. If the payments were meant to be mandated without the need for appropriation, there would have been no need to channel the payments through LGAC, using the incentive of the trapping mechanism of State Finance Law § 92-r. Therefore, we conclude that the MAC Refinancing Act does not violate article VII, § 11, of the New York State Constitution.
 
 [7]
 

 
 *539
 
 Municipal Debt
 

 LGAC further contends that the Act violates New York State Constitution, article VIII, § 2, because it permits the City to assign to STARC its right to receive LGAC’s annual payment of $170 million. LGAC argues that the City’s assignment of this right to STARC, in exchange for the proceeds on the bonds that STARC would issue, constitutes a debt of the City, on which the City has not pledged its faith and credit. We disagree.
 

 The State Constitution prohibits the City from contracting any indebtedness unless it pledges its “faith and credit” for the payment of the principal and interest on the debt (NY Const, art VIII, § 2). The purpose of this provision is obvious—to ensure that the municipalities honor their legal financial obligations to their creditors
 
 (see generally Flushing Natl. Bank v Municipal Assistance Corp.,
 
 40 NY2d 731 [1976]). Debt has a well-settled meaning within the contemplation of the State Constitution. A debt can arise only where the municipality has incurred a legal obligation to fund the public benefit corporation’s debt service to its bondholders should the corporation default on its obligation
 
 (see Wein v City of New York,
 
 36 NY2d at 617-618;
 
 Schulz v State of New York,
 
 84 NY2d 231, 247-249 [1994]). Thus, the City’s assignment to STARC of payments that the City would otherwise receive from LGAC can be considered a debt of the City only if the City could be held liable to STARC or its bondholders in the event that LGAC failed to make the payments to STARC.
 

 Like Supreme Court and the Appellate Division, we conclude that our decision in
 
 Wein
 
 is dispositive of this issue. In
 
 Wein,
 
 pursuant to the New York City Stabilization Reserve Corporation Act, the Mayor of the City of New York was authorized to certify $520 million over the course of two succeeding fiscal years to the Stabilization Reserve Corporation (SRC). SRC would then sell $520 million of its own bonds and notes, the proceeds of which would be paid into the City’s general fund. Under the applicable statute, the bonds and notes were the sole obligations of the SRC, and neither the State nor the City would be liable for payment on the debt service. The bonds were financed out of SRC’s capital reserve fund. To assure proper maintenance of the fund, the City was to make a yearly appropriation to the fund. If the City failed to make the appropria
 
 *540
 
 tion, the State Comptroller would pay SRC the amount certified out of revenue that would otherwise have been payable to the City (see
 
 Wein v City of New York,
 
 36 NY2d at 614-615).
 

 In rejecting plaintiff taxpayer’s article VIII, § 2 challenge to the New York City Stabilization Reserve Corporation Act, we noted that the terms of the statute precluded the City from becoming indebted to SRC or its bondholders. We held that article VIII, § 2 did not apply because the City could not be held liable to the bondholders even if the City failed to make the payments, thereby causing SRC to default
 
 (id.
 
 at 617-618).
 

 In this case, as in
 
 Wein,
 
 the City has no legal obligation either to STARC or to its bondholders should LGAC fail to make its payments to STARC. Although the Act does not specifically state that the City incurs no obligation with respect to STARC’s bondholders, it does not impose such an obligation. And significantly, the City’s avoidance of this debt obligation is abundantly clear in the record. According to STARC’s certificate of incorporation, “no member of the City Group will guarantee debts of the Corporation.” Moreover, the assignment agreement between the City and STARC states:
 

 “City Not Liable on Bonds.
 
 It is the intention of the City and [STARC], and they do agree, that the Fiscal 2004 Bonds shall not be a debt of the City and the City will not have any obligation or liability thereon.”
 

 The preliminary offering circular on STARC’s Series A bonds states:
 

 “None of the payments to LGAC, to [STARC] by LGAC or to the Bondholders by [STARC] constitutes a debt of the State or the City, and neither the faith and credit nor the taxing power of the State or the City is pledged to the payment of amounts to LGAC, to [STARC] by LGAC or to the payment of the Series 2004A Bonds.”
 

 Finally, the preliminary offering circular on STARC’s Series B bonds states:
 
 *541
 
 The terms of the assignment between the City and STARC cannot be clearer on this point—the City has no obligation to STARC with regard to LGAC’s payments and has no liability to STARC’s bondholders in the event that STARC defaults. Therefore, the City has not incurred any enforceable debt with respect to the assignment and article VIII, § 2 of the State Constitution does not apply.
 

 
 *540
 
 “Payments to the Series 2004B Bondholders by [STARC] do not constitute a debt of the State or the City, and neither the faith and credit nor the taxing power of the State or the City is pledged to the payment of the Series 2004B Bonds.”
 

 
 *541
 
 We further reject LGAC’s contention that the assignment of the City’s right to receive the payments in exchange for bond revenues violates a purported “ban on revenue financing.” According to LGAC, “[t]he purposes of the prohibition are to prevent local governments from evading constitutional debt limitations and committing their revenues to long-term obligations that are not conditioned on future local legislative appropriations and that are therefore beyond any local legislative power to alter in response to changed needs and conditions.” Although LGAC couches this argument in terms of article VIII, § 2 of the State Constitution, this concern about inhibiting future local administrations from determining the use of its revenues has nothing to do with a city’s obligation to pledge its faith and credit to its debt obligations. Rather, it appears to be a separate policy consideration altogether.
 

 In any event, here there is no diversion of a preexisting revenue stream that the City otherwise would have received. Rather, the Legislature created an additional revenue stream of state funds through LGAC which enabled the City to receive revenues that had been diverted for payment of debt service on the MAC bonds. Moreover, the assignment here does not affect the ability of future local administrations to determine how the payments from LGAC ought to be expended. Pursuant to Public Authorities Law § 3238-a, upon the City’s assignment of LGAC’s payments to STARC, the amount becomes “the property of [STARC] for all purposes,” and upon the City’s notice to LGAC and to the State Comptroller of the assignment, the payments must be made directly from LGAC to STARC. Thus, the assignment constitutes a transfer of the City’s entire property interest in the revenue stream. It is not a perpetual spending of the City’s revenue on STARC, but is rather a one-time assignment of a property right, and once it is made, the City has no interest in any of the LGAC payments. STARC thereby has full ownership of the entire revenue stream. Thus, there is no interference in the appropriation power of future local administrations. Simply stated, a city council cannot appropriate revenue that it does not own.
 

 
 *542
 
 Still, even if the City would otherwise have an interest in the LGAC payments, this Court has held that the diversion of municipal funds to a public benefit corporation does not necessarily run afoul of the State Constitution. As earlier noted, we upheld the financing program in the
 
 Wein
 
 case, in which the corporation’s capital reserve fund was financed by city appropriation, and failing that appropriation, by the State’s diversion of city revenues to the corporation
 
 (see Wein v City of New York,
 
 36 NY2d at 618). Indeed, we stated, “The fact that the comptroller is permitted, under certain circumstances, to pay a portion thereof directly to a public benefit corporation on behalf of the city, does not create any illegality, and we hold and find that no lien is thereby created on that fund”
 
 (id.
 
 at 619).
 

 Also, in
 
 Comereski v City of Elmira
 
 (308 NY 248 [1955]), we recognized that it was constitutionally permissible for a municipality to provide in a contractual agreement with an authority that, on the one hand, the authority’s bonds create no liability for the municipality, and on the other hand, permit or mandate that the municipality make some kind of direct assistance to the authority
 
 (see id.
 
 at 254 [“(A) city’s nonliability on an authority’s bonds and the same city’s right or duty to assist the authority financially are part of the same conventional statutory pattern. We should not strain ourselves to find illegality in such programs”]). As we emphasized in both
 
 Wein
 
 and
 
 Comereski,
 
 if the State were to funnel money to a public benefit corporation that would otherwise be paid to the municipality, the payment would constitute a permissible gift under article VIII, § 1 of the State Constitution
 
 (see Wein v City of New York,
 
 36 NY2d at 618;
 
 Comereski v City of Elmira,
 
 308 NY at 252-253).
 

 We recognize that there are numerous programs providing for the payment of a public benefit corporation’s debt service through the diversion of state aid paid on behalf of a municipality. The most obvious example of such a program, of course, is the diversion of the City’s interest in the state sales tax to MAC itself in order to pay the debt at issue in this litigation. Another prominent example is the utilization of public authorities by several counties of the State, including New York, Westchester, Erie and Nassau, for the issuance of bonds to provide immediate revenue to the respective counties, with the financing of these bonds secured by the proceeds the counties are to receive under the national tobacco settlement (Kasprak,
 
 Securitization of Tobacco Settlement Funds,
 
 Report of Conn Gen Assembly Off
 
 *543
 
 of Legis Research [Sept. 20, 2002] <http://www.cga.state.ct.us/ 2002/olrdata/ph/rpt/2002-R-0736.htm>). As we stated in
 
 Wein,
 

 “While the constitutional validity of these other enactments is not before us, we must assume that the legal and constitutional basis for the funneling of a municipality’s State-aid moneys to these other public benefit corporations by the State Legislature, is founded on the similar right of a municipality to make gifts to a public benefit corporation pursuant to section 1 of article VIII of the Constitution and the other cited authorities. Upon a contrary holding it could be argued, successfully or otherwise, that their funding would be illegal.”
 
 (Id.
 
 at 619.)
 

 We therefore conclude that the MAC Refinancing Act does not violate New York State Constitution, article VIII, § 2.
 

 Impairment of Contracts
 

 In its final constitutional challenge, LGAC maintains that the MAC Refinancing Act impairs the preexisting contractual rights of its bondholders (US Const, art I, § 10). Pursuant to the general bond resolutions adopted in 1991 and 2002, LGAC pledged to its bondholders that they would have first priority on the funds available to LGAC. While LGAC is permitted to issue other debt instruments, any obligations to disburse funds on such instruments must be subordinated to the bondholders’ rights and cannot adversely affect LGAC’s ability to satisfy its debt on the bonds. Under Public Authorities Law § 3241 (1), the State pledged to LGAC bondholders that it would not limit or alter their rights and remedies to receive the principal and interest due them on the bonds.
 

 LGAC argues that the Act impairs the rights that LGAC bondholders enjoy under the bond resolutions in violation of United States Constitution, article I, § 10 (1), which states, in pertinent part, “No State shall . . . pass any . . . Law impairing the Obligation of Contracts.” LGAC rests its argument on the first sentence of Public Authorities Law § 3238-a: “Notwithstanding any inconsistent provision of law, [LGAC] shall transfer to the city of New York [$170 million] from the resources of [LGAC] pursuant to section [3239] of this title.” According to LGAC, this provision gives the payments to the City a greater priority than that afforded to the LGAC bondholders, even though LGAC’s contracts with its bondholders promised them first priority over any other debtors. LGAC urges that if
 
 *544
 
 there were a shortfall in the funds available for payment to the City and to LGAC’s bondholders, the language of section 3238-a would require LGAC to disburse payments to the City at the expense of monies due to LGAC bondholders. We reject this contention.
 

 The interpretation that LGAC urges this Court to give to the Act would require us to find that the Legislature modified or repealed Public Authorities Law § 3241 (1) by implication. For us to do so would be to ignore the fundamental tenet of statutory construction that implied repeal or modification of a preexisting law is distinctly disfavored
 
 (see Iazzetti v City of New York,
 
 94 NY2d 183, 189 [1999];
 
 Matter of Consolidated Edison Co. of N.Y. v Department of Envtl. Conservation,
 
 71 NY2d 186, 195 [1988];
 
 Besser v E.R. Squibb & Sons,
 
 146 AD2d 107, 114 [1st Dept 1989],
 
 affd
 
 75 NY2d 847 [1990]). “[T]he judiciary should not lightly infer that the Legislature has repealed one of its own enactments when it has failed to do so expressly; the Legislature is hardly reticent to repeal statutes when it means to do so”
 
 (Alweis v Evans,
 
 69 NY2d 199, 204 [1987]). Generally, a statute impliedly repeals a prior statute “only if the two are in such conflict that it is impossible to give some effect to both”
 
 (id.).
 
 “If by any fair construction, a reasonable field of operation can be found for [both] statutes, that construction should be adopted”
 
 (People v Newman,
 
 32 NY2d 379, 390 [1973]). Thus, in the absence of some expressed legislative intent to limit or repeal the State’s guarantees to LGAC’s bondholders under Public Authorities Law § 3241 (1), we will not interpret the Act to have that effect. Rather, harmonizing the provisions of the statute, as we must
 
 (see Alweis v Evans,
 
 69 NY2d at 204), we conclude that while section 3238-a requires LGAC to make annual payments to the City, it does not modify or repeal the State’s pledge to honor the contractual rights and remedies of LGAC’s bondholders pursuant to section 3241 (1).
 

 Public Authorities Law § 3241 (1) was clearly intended to pledge to LGAC and its bondholders that the State would honor the rights and remedies that the bondholders enjoy under their agreement with LGAC. Indeed, the provision permitted the pledge of the State to be incorporated into the agreement of the bondholders, and it subsequently was so incorporated. Pursuant to their contract with LGAC, the bondholders have first priority on appropriated monies in the Tax Fund. Thus, section 3241 (1) constituted the State’s pledge to honor the bondholders’ prior lien on the appropriated funds.
 

 
 *545
 
 The Legislature’s subsequent enactment of the MAC Refinancing Act did not modify or repeal the State’s pledge to honor LGAC’s contracts with its bondholders. As previously stated, the purpose of the Act was to provide for an annual appropriation of funds to the City in order to assist it in its repayment of the MAC debt. The Legislature sought to channel the payments through LGAC by way of its established certification process. In doing so, the Legislature sought to require LGAC to make the payments to the City using the same method by which it made payments on its debt service. A plain reading of the phrase ‘ ‘ [n] otwithstanding any inconsistent provision of law” in section 3238-a reveals an intent on the part of the Legislature to require LGAC to make the annual payments to the City, even if some other provision would prohibit LGAC from making payments of this sort. Section 3241 (1) merely confirms the priority of payment set forth in LGAC’s contract with its bondholders. It does not prohibit LGAC from making such payments to the City, and so is not inconsistent with the intent of section 3238-a. And importantly, nowhere in section 3238-a does the Legislature expressly undermine section 3241 (1) or otherwise establish a new order of priority on the payments that LGAC must make from its appropriated funds, and we decline to impose such a reading upon the statute.
 

 Indeed, we find no intent on the part of the Legislature to give STARC bondholders an equal or greater priority than LGAC bondholders. After all, in the normal course of events, the amount of money in the Tax Fund would be substantially more than LGAC needs to satisfy its annual expenses, including that required to pay the City.
 
 [8]
 
 The size of the Tax Fund even following a disbursement, coupled with the trapping mechanism of State Finance Law § 92-r (5)—which would prohibit the Comptroller from making the excess revenue available to the state general fund until LGAC receives its requested money— creates a powerful incentive for the Legislature to appropriate the entire amount requested in LGAC’s annual certification. Certainly, this was the result intended by the Legislature when it promulgated State Finance Law § 92-r (5). Reading the statute as a whole, it is apparent that the Legislature intended the size of the Tax Fund and the trapping mechanism to assure LGAC’s payments to the City, not an alteration to the lien status
 
 *546
 
 of the LGAC bondholders. To be sure, if for whatever reason there were not enough money appropriated to LGAC to meet all of its payment obligations, the LGAC bondholders would have first priority on the appropriated funds and the right of STARC to receive payment would be subordinate.
 

 Indeed, STARC concedes that the rights of LGAC bondholders are superior to its right to receive payments pursuant to Public Authorities Law § 3238-a. This concession was expressed three times in STARC’s preliminary offering to prospective bondholders. In one of these instances, the offering states, “The payments LGAC is required by the [MAC Refinancing Act] to make to [STARC] from the Tax Fund will be subordinate to the payments LGAC is required to make pursuant to its bond resolutions.” STARC has also offered to enter into a contract with LGAC confirming that the rights of LGAC bondholders to the money appropriated to LGAC would have priority over the rights of STARC bondholders. While a concession of priority rights in STARC’s preliminary offering plan and in an agreement between the parties may not alter the statute, it is significant to note that as a practical matter, LGAC’s concerns about the impairment of its bondholders’ contracts simply will not come to fruition.
 

 Accordingly, the order of the Appellate Division should be modified, with costs to defendants, by reinstating the September 17, 2003 order of Supreme Court and, as so modified, affirmed.
 

 Chief Judge Kaye and Judges Ciparick, Rosenblatt, Graffeo and Read concur; Judge R.S. Smith taking no part.
 

 Order modified, etc.
 

 [1]
 

 . At the time LGAC was created, the State was encountering fiscal problems from so-called “spring borrowing,” which developed because the State’s fiscal year ends on March 31, whereas the fiscal year of local governments ends on June 30. Spring borrowing occurred when local governments, in the last quarter of their fiscal year, would borrow money from the State during the first quarter of its fiscal year. LGAC was created to eliminate this practice by providing funding for local government needs.
 

 [2]
 

 . Prior to the amendment of the provision by the MAC Refinancing Act, Public Authorities Law § 3240 (5) stated:
 

 “The agreement of the state contained in this section shall be deemed executory only to the extent of appropriations available for payments under this section and no liability on account of any such payment shall be incurred by the state beyond such appropriations. The state, acting through the director of the budget, and the corporation may enter into, amend, modify, or rescind one or more agreements providing for the specific manner, timing, and amount of payments to be made under this section, but only in conformity with this section.”
 

 [3]
 

 . Following the enactment of the MAC Refinancing Act, each house of the Legislature passed separate “clean-up” bills to correct drafting errors in the prepared budget bills, although neither clean-up bill was enacted (2003 NY Assembly Bill A 9097 part J; 2003 NY Senate Bill S 5692 part J). These bills were similar in that they both sought to substitute the amended sentence in Public Authorities Law § 3240 (5) with language providing that agreements relating to payments made under section 3238-a would not be contrary to the intent of that provision. In addition, both bills sought to delete from section 3238-a the phrase “Notwithstanding any inconsistent provision of law.” The bills also would have delayed the first payment to the City until the fiscal year ending June 30, 2005. Furthermore, both bills sought to add a sentence to section 3238-a which would have explicitly subordinated LGAC’s payments on behalf of the State to LGAC’s payments to its bondholders.
 

 [4]
 

 ,
 
 Laws of 1990, chapter 220, sec 1, § 3234 (1) reads as follows:
 

 “The corporation shall be administered by three directors, one of whom shall be the comptroller, one of whom shall be the director of the budget and one of whom shall be appointed by the governor. A director who is not a state official shall serve for a term expiring at the end of the term actually served by the officer making the appointment and may be removed for cause by such officer after hearing on ten days notice.”
 

 [5]
 

 . On August 12, 2003, STARC issued a preliminary offering circular for approximately $24 million in Series B bonds, the proceeds of which would be used to finance the Series A debt service in the event that the City was unsuccessful in its anticipated litigation. Payment on Series B bonds would otherwise be made in the manner described in the prehminary offering circular for Series A bonds.
 

 [6]
 

 . On August 13, 2003, Supreme Court issued a temporary restraining order preventing the issuance of STARC bonds.
 

 [7]
 

 . We further reject LGAC’s contention that—by specifying that $170 million be transferred annually to the City by LGAC ‘‘ [n]otwithstanding any inconsistent provision of law” (Public Authorities Law § 3238-a)—the Act creates an “unambiguous” and “absolute” command that the $170 million be paid by the State each year, regardless of an appropriation. The challenged
 
 *539
 
 provision refers only to LGAC’s payments to the City, not to the State’s payments to LGAC, which must, of course, be subject to appropriation.
 

 [8]
 

 . According to STARC, in the state fiscal year ending March 31, 2002, the amount in the Tax Fund was more than three times the amount of LGÁC’s payment requirements, including a $170 million appropriation.